**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KATHY ANN HOLSINGER,**

       **Plaintiff,**

                                  **Civil Action 2:12-cv-714**
                                  **Judge James L. Graham**
   **v.**                              **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Kathy Ann Holsinger, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply (ECF No. 18), and the administrative record (ECF No. 11).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.     BACKGROUND

Plaintiff protectively filed her application for benefits on December 21, 2008, alleging that she has been disabled since August 15, 1994, at age 37.  (R. at 98-99.)  She met the financial requirements for disability insurance benefits eligibility through June 30, 1999.  Thus, June 30, 1990, is Plaintiff's date last insured ("DLI") under the Act.  Plaintiff alleges disability as a result of migraine headaches and a back injury caused by a fall.  (R. at 120.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative Law Judge Alfred J. Costanzo ("ALJ") held a video hearing on May 5, 2011, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 32-48.)  Linda Augins, a vocational expert, also appeared and testified at the hearing.  (R. at 49-51.)  On May 13, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 12-21.)  On June 19, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-3.)  Plaintiff then timely commenced the instant action.

## II.     HEARING TESTIMONY

### A.     Plaintiff's Testimony

At the May 5, 2011 hearing, Plaintiff testified that she lived alone.  She had attended two years of practical nursing school, becoming a licenced practical nurse (LPN).  (R. at 33.)  She has not worked since 1994.  (R. at 34.)

Upon examination by her counsel, Plaintiff testified that she began suffering from migraines in high school.  (R. at 34-35.)  Around the time she stopped working in 1994, she

experienced migraines between two-to-three times a week and sometimes daily.  (R. at 35.)
Plaintiff explained that after she graduated from nursing school, she became a scrub nurse in the
operating room.  She was able to do this for a couple years, but the stress, the operating room
lights, and sunshine triggered her migraines.  (R. at 36.)  Plaintiff described her migraines as
starting in her neck, upper back, and shoulders before progressing to blur her vision and numb
her face.  (*Id*.)  She testified that after a migraine, she would need to go to bed for a couple of
days.  Plaintiff represented that towards the end of her employment, she experienced migraines
on a daily basis that lasted two-to-three days and that immediately afterwards, she would have
another migraine.  (R. at 36-37.)  She said that she could no longer work because she needed to
lay in bed to get rid of her migraines.  (R. at 37.)

At that time, Plaintiff was taking the narcotic medication Soma and became addicted to
it.  (R. at 37.)  Plaintiff testified that she made a mistake at work that "scared" her, which she
attributes to feeling "migrane-ish" and on medication.  (R. at 37-38.)  She said that she realized
then that she was not fit to continue working.  (R. at 38.)  Plaintiff described herself as "always a
good worker," adding that the people at her work "always liked her."  (*Id*.)  She was not
terminated, but "let [her employer] know [she] could [not] come back" because she did not feel
as though she was reliable.  (*Id*.)

Plaintiff testified that she eventually went to a drug rehabilitation center as a outpatient
and was able to stop taking narcotics.  (R. at 39.)  She reports that no medications worked to curb
her migraines until Dr. Nelson prescribed Valium and Xanax in 1999.  Plaintiff added that those
medications controlled her migraines, but that she could not work under those medications
because when she took them, she was "in la-la land."  (*Id*.)  As of the date of the hearing,

3

Plaintiff continued to take Valium, Topomax, and an additional medication she could not recall to control her headaches.  (R. at 40.)

Plaintiff testified that she had a history of osteoporosis from Turner's Syndrome[1] and also a history of pain in her upper back and upper cervical area, which would trigger her migraine headaches.  (R. at 40.)  She also testified that she suffered from back pain throughout her employment and beyond.  Plaintiff reported three instances in which she was injured, including getting hit in the head with the boom from a sailboat; a motor vehicle accident; and a fall when she lived in South Carolina.  (R. at 41.)  The sailboat incident occurred before she quit her job as a nurse.

Plaintiff opined that she would not have been able to work at any type of job, even a simple job because of the frequency of her symptoms.  (R. at 42.)  She indicated that she would drive, but would sometimes need to pull off the road to wait for her vision to clear.  (R at 43.)  Plaintiff further reported that she often would be confined to her home for a week at a time because of her symptoms.  She said she experienced this severity of symptoms until 1999, when she received assistance.  (R. at 44.)

Plaintiff testified that prior to 1999, the narcotics her doctor prescribed did not work, but that she told her doctor they did because she was addicted to them.  She also indicated that she tried Imitrex, but that it made her nauseous.  She further indicated that she drank beer and

---

[1]Turner's syndrome, a condition that affects only girls and women, results from a missing or incomplete sex chromosome.  Turner's syndrome can cause a variety of medical and developmental problems, including short stature, failure to begin puberty, infertility, heart defects, and certain learning disabilities.  *Available at* http://www.mayoclinic.com/health/turner-syndrome/DS01017.

smoked marijauna to stop her migraines until 1995 or 1996, when she went to Alcholics Anonymous.  (R. at 45.)

Plaintiff estimated that she traveled back and forth from South Carolina to Ohio four times a year from 1994 through1996 to care for her sick mother.  (R. at 46-47.)  She made this trip more frequently the year her mother passed.  She testified that she made the ten-hour trip by herself and that she would stop three or four times on her way.  (R. at 47.)

Finally, Plaintiff reported that because of her Turner's Syndrome, she had developed bicuspid aortic valve syndrome.  (R. at 48.)

**B.     Vocational Expert Testimony**

Linda Augins testified as the vocational expert ("VE") at the administrative hearing.  (R. at 49-51.)  The ALJ noted that under the regulations, because all of Plaintiff's work was beyond the 15-year period, Plaintiff is considered to have no past relevant work.  The ALJ posed a hypothetical question regarding Plaintiff's residual functional capacity ("RFC") to the VE from her alleged onset date until the date she was last insured.  The ALJ asked the VE to consider a claimant with Plaintiff's vocational profile who was limited to no more than light work, with only occasional postural activity, only occasional overhead reaching, and only occasional pushing and pulling with both upper extremities.  Due to pulmonary issues, the hypothetical claimant should not be exposed to dust, smoke, chemicals, fumes, and other similar pulmonary irritants.  Non-exertional limitations included limiting the hypothetical claimant to simple, unskilled work involving minimal, if any, public interaction.  Further, the individual would require a stable work environment with little change in the work process from day-to-day.  (R. at 50.)  Based on this hypothetical, the VE testified that the hypothetical individual could perform

5

other jobs at the light, unskilled level, such as a small parts assembler, with 540,000 jobs nationally; and a garment bagger, with 919,000 jobs nationally. (R. at 50-51.) The individual could also perform sedentary, unskilled jobs such as a blood bank scheduler with 2.3 million jobs in the nation and pricing clerk with 461,000 national jobs. (R. at 51.) The VE next added that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*) Finally, in answer to the ALJ's followup question, the VE testified that if the individual was not able to maintain regular attendance due to both physical and non-exertional limitations, it would eliminate work. (*Id.*)

### III. MEDICAL RECORDS

**A. Pre-Alleged Onset Date**

The earliest medical records show that Plaintiff was admitted to St. John's Medical Center for several days for back, neck, and shoulder pain in March 1981. (R. at 323-25.) The attending physician noted that Plaintiff had scars over her neck and her supraclavicular fossa, which reflected the release of her cervical webbings as consistent with the diagnosis of Turner's Syndrome. (R. at 323.) X-rays of Plaintiff's cervical spine reflected some anomalous configuration with incomplete fusion of the posterior elements of C1 and possibly partial fusion of the C1 to the posterior portion of the skull. (R. at 325.)

In June 1981, Thomas G. Skillman, M.D., an endocrinologist, opined that Plaintiff's osteoporosis was a genetic defect related to her Turner's Syndrome. He recommended that Plaintiff take a "preparation" containing flouride, vitamin D, and calcium to help her stimulate the formation of new bone or to at least decease the rate of bone loss. (R. at 326-27.) Dr.

Skillman also suggested that she avoid lifting more than ten pounds, adding that "this is a good thing to get used to."  (R. at 328.)

In January 1982, Plaintiff's primary care physician, Dr. Larrimer, noted that Dr. Skillman had placed Plaintiff on disability.  (R. at 331.)  He reiterated Dr. Larrimer's opinion that Plaintiff was unable to lift greater than ten pounds.  Dr. Larrimer noted that outside of her osteoporosis, Plaintiff "is doing fairly well medically and [that her] physical exam was otherwise very good." (*Id.*)  He recommended that Plaintiff finish her college education, adding that a college education "would definitely help her in the future as far as job status is concerned."  (*Id.*)

In March 1982, Nichols Vorys, M.D., an infertility and gynecology specialist, noted "[t]here can be no question in anybody's mind that you have Turner's Syndrome and Osteoporosis. There should be no question that your activities should be limited."  (R. at 332.)

In February 1989, Plaintiff underwent an operation for a bilateral Turner's Syndrome web neck deformity to release the scared ends and bilateral trapezius partial myotomies.  (R. at 333.)

Plaintiff presented to rheumatologist, John Whelton, M.D. in May 1989.  X-rays taken of Plaintiff's thoracic spine showed mild compensated scoliosis.  Dr. Whelton noted "mild but definite changes of degenerative disc disease and osteoarthritic changes."  (R. at 341-42.)  A May 1989 bone density scan showed that Plaintiff had a mild fracture risk in the lumbar and femoral regions.  (R. at 334-39.)

In July 1994, Vaughn R. Barnick, M.D. examined Plaintiff and found that she had a full range of motion in her cervical spine, but some discomfort and a palpable spasm in her trapezius. (R. at 348.)

**B.      Post-Alleged Onset Date (August 14, 1994)**

In August 1994, Dr. Barnick, noted that Plaintiff had "an excellent response" to "[u]sing Soma only sparingly," explaining that Plaintiff was no longer experiencing headaches or cervical strain.  (R. at 347.)  He further noted that Plaintiff was not experiencing chest pain or shortness of breath and described her Turner's syndrome as "stable."  (*Id*.)  Dr. Barnick remarked that with the exception of Plaintiff's complaint of "a very painful throat" that resolved itself spontaneously within two days, Plaintiff "has been feeling well."  (*Id*.)

In September 1994, Dr. Barnick noted that Plaintiff had just returned to South Carolina from Ohio after visiting her mother who had breast cancer.  (R. at 350.)  Plaintiff complained that she had increased palpitations accompanied by shortness of breath and sore throat while in Ohio.  Dr. Barnick noted that Plaintiff was "increasingly tearful and depressed even though she remains on Desyrel."  (*Id*.)  He further noted that Plaintiff's lungs were completely clear and that she was sleeping well though the night.  (*Id*.)

In July 1995, Dr. Barnick noted that Plaintiff reported incurring a back strain earlier in the year for which she sought treatment in Ohio from a chiropractor.  (R. at 351.)  Dr. Barnick noted that Plaintiff had been traveling back and forth from South Carolina to Ohio to care for her mother.  (*Id*.)  Dr. Barnick did not change her medications and noted that Plaintiff was "without complaint."  (*Id*.)

In December 1995, Dr. Barnick described Plaintiff as "doing well though somewhat fatigued."  (R. at 352.)  His listed impressions included Turner's syndrome, anxiety with depression, and hypotension on betablocker therapy.  (*Id*.)

In August 1996, Dr. Barnick remarked that Plaintiff was "feeling well without significant complaint," but that "migraine headaches remain a problem."  (R. at 353.)  Plaintiff reported experiencing a "significant migraine" approximately once per month, usually ten days premenstrual.  (*Id*.)  He continued to prescribe the narcotic Soma based upon Plaintiff's report that it worked best.  Dr. Barnick noted that Plaintiff reported no changes in hearing or vision and that she denied any chest pain.  (*Id*.)  He described Plaintiff's Turner Syndrome as "stable" and noted that her bone density scan was within normal limits.  On August 1, 1996, Dr. Barnick noted that Plaintiff's Turner syndrome was stable and that her chronic migrainous headache syndrome was "reasonably stable" on betablocker and Trazodone.  (R. at 354.)  He again encouraged tobacco cessation.  (*Id*.)

On January 20, 1997, Plaintiff reported that she felt "remarkably improved" on Prozac, noting a "marked reduction in her chronic headaches."  (R. at 356.)  During this visit, Plaintiff reported that she had "suffered from lifelong depression."  (*Id*.)  She described herself as "feeling normal again," but noted that she continued to experience some degree of depression premenstrually.  (*Id*.)  Dr. Barnick recommended that Plaintiff try Megavytes to treat her depression.  (*Id*.)

In May 1997, Dr. Barnick reported that Plaintiff had a "complete resolution of headaches" on Prozac.  (R. at 357.)  Plaintiff did, however, report that she was experiencing problems with insomnia.  Dr. Barnick speculated that this may be attributable, in part, her serving as "her mother's night nurse during her prolonged and terminal illness."  (*Id*.)  Dr. Barnick remarked that with the exception of her reported insomnia, Plaintiff was "otherwise without significant complaint."  (*Id*.)

9

In August 1997, Plaintiff reported feeling excitement in anticipation of attending a national meeting on Turners's Syndrome in Minneapolis.  (R. at 358.)  Plaintiff reported that she continued to suffer chronic and incapacitating headaches and that she was applying for disability on that basis.  Dr. Barnick noted that otherwise, Plaintiff was feeling well.  (*Id.*)

On January 6, 1998, Plaintiff presented to Laura Hamilton, M.D., a colleague of Dr. Barnick.  (R. at 361.)  Dr. Hamilton noted that Plaintiff had a history of Turner's syndrome and alcoholism, as well as a smoking history.  Within her assessment notations, Dr. Hamilton indicated that Plaintiff's bronchitis infection was resolving; that she was receiving treatment for substance abuse, but that she continues to smoke; PMS; and Turner's Syndrome.  (*Id.*)

In February 1998, Dr. Barnick noted that Plaintiff was in Alcoholics Anonymous ("AA") for alcohol abuse.  He "discussed at length the necessity of withdrawal from all habit forming drugs," including the narcotic Soma Plaintiff took for reported headaches.  (R. at 362.)  Dr. Barnick remarked that Plaintiff appeared to "be doing well with regards to her depression" in light of the fact that her husband recently informed her that he was going to leave her.  (*Id.*)

In March 1998, Plaintiff reported that she had been strangled by her husband.  (R. at 363.)  Plaintiff indicated that she had reported to the emergency room after the incident and received an injection for pain.  Plaintiff denied any difficulty breathing.  Dr. Barnick was unable to discern any abnormalities attributable to the incident.  (*Id.*)  He described Plaintiff as "tearful."  (*Id.*)

In May 1998, Plaintiff reported that on the narcotic Soma, her neck felt better than it had since the surgery.  Dr. Barnick noted that with the exception of her continuing to experience

10

"some depressive symptoms," Plaintiff was "really without complaint."  (R. at 364.)  Plaintiff

reported that her Prozac medication "seem[ed] sedating."  (*Id.*)

On June 12, 1998, Plaintiff presented to Dr. Barnick with complaints of sinus congestion

and a sore throat.  (R. at 365.)  Plaintiff reported that earlier, she had presented to the emergency

room with symptoms of congestion and wheezing.  The hospital treated Plaintiff with oral

steroids and inhalation therapy.  Plaintiff reported that she was told she has asthma.  (*Id.*)  Dr.

Barnick remarked that Plaintiff did not have a prior history of asthma beyond two episodes of

asthmatic bronchitis.  (*Id.*)  He "strongly encouraged discontinuation of all smoking."  (*Id.*)  One

week later, on June 19, 1998, Plaintiff presented to Leslie M. Stuck, M.D., another practitioner

in Dr. Barnick's office, with complaints of worsening wheezing.  (R. at 366.)  Dr. Stuck noted

that Plaintiff's lungs were clear and that Plaintiff was to follow-up after a pulmonary function

test.  She also noted that Plaintiff continued to smoke.  (*Id.*)  A June 23, 1998 pulmonary

function test revealed only mild limitation in air flow with moderate reduction in maximum

voluntary ventilation and diffusion capacity.  (R. at 218.)  Dr. Preston Jones, the pulmonary

specialist, listed his final impression as "[m]ild obstructive defect."  (*Id.*)  He added that

Plaintiff's diffusion capacity suggested a emphasematous component.  (*Id.*)

In July 1998, Plaintiff presented to Dr. Barnick with complaints of shoulder pain that she

developed during a trip from South Carolina to Ohio and back.  Dr. Barnick administered an

injection to her shoulder and noted "good immediate results."  (R. at 367.)  He recommended

physical therapy, but Plaintiff declined.  He continued her Soma narcotic medication.  (*Id.*)

On July 31, 1998, Plaintiff presented to Ralph S. Owings, Jr., M.D., an orthapedic

specialist.  Dr. Barnick had referred Plaintiff to Dr. Owings due to Plaintiff's complaints of

shoulder pain.  Dr. Owings noted that Plaintiff had tried various means to control her migraine headaches without success.  (R. at 369.)  Dr. Owings' examination revealed that her spine had full range of motion with no marked spasm, mass, or anything palpable.  (*Id*.)  He noted that "[t]here may be a very, very slight scoliosis in the mid-back area."  (*Id*.)  The x-rays revealed a "fairly normal looking cervical spine" with Plaintiff's "disc spaces all maintained."  (*Id*.)  Dr. Owings found no spurring or significant osteophyte formation.  Based upon his examination and the x-ray, Dr. Owings opined that Plaintiff's reported shoulder pain was not attributable to an orthopaedic problem.  (R. at 369-70.)  He speculated that the pain was related to her migraines. (*Id*.)  He declined to prescribe medication, indicating that Plaintiff needed to first get things worked out at the substance abuse rehabilitation center and then discuss pain management with Dr. Barnick.  (*Id*.)  Dr. Owings further recommended that Plaintiff see Dr. Carnes, M.D., a neurologist, to see if he had any helpful advice.  (*Id*.)

In August 1998, Dr. Carnes examined Plaintiff.  (R. at 371-72.)  He noted that Plaintiff had a history of bulimia and that her chief complaint was migraines.  Plaintiff reported that she when she has headaches, she often awakens feeling energetic, but later develops numbness in her mouth often accompanied by blurred vision.  (*Id*.)  Plaintiff also reported that she was a recovering alcoholic and addict and that she continued to smoke two or three packs of cigarettes daily.  Dr. Carnes' mental status exam revealed that Plaintiff was "alert and oriented times three and shows appropriate attention and concentration."  (*Id*.)  He found no abnormalities with Plaintiff's recent and remote memory or her general fund of knowledge.  Further testing revealed excellent strength to specific muscle testing in her upper and lower extremities, without atrophy, good coordination, and reflexes that were two-plus and symmetric throughout.  Under

"impression," Dr. Carnes listed "chronic headache syndrome, with a vascular component";
history of bulimia; and history of chemical dependency. Given her dependency issues, Dr.
Carnes started Plaintiff on the antidepressant Amitriptyline. (*Id.*)

In January 1999, Plaintiff reported to Nehal T. Desai, M.D., an internist. Dr. Desai noted
his impression that Plaintiff suffered from edema, chest pain syndrome, and myalgias of upper
back. (R. at 421.) The following month, Dr. Desai noted that his impressions included chest
pain syndrome, fluid retention, and osteoporosis. (R. at 423.)

Due to Plaintiff's complaints of "increasing chest pain over the last few months,"
Plaintiff underwent a treadmill exercise test, an echocardiogram, and a diagnostic heart
catheterization. (R. at 502-09.) Plaintiff terminated her February 2, 1999 treadmill test after
nine minutes because of reported leg pain and fatigue. (R. at 503.) On February 8, 1999,
Plaintiff underwent an echocardiogram. Plaintiff's echocaridiogran was essentially normal with
a "[t]race of aortic insufficiency, pulmonic insufficiency, mitral regurgitation, and tricuspid
regurgitation." (R. at 506, 507.) Myron Bell, M.D. noted that Plaintiff was "on a host of
medications and had recurrent chest pain while exercising on a treadmill." (R. at 507.) On
March 8, 1999, Plaintiff underwent a diagnostic heart catheterization. (R. at 506-08, 424.) Dr.
Bell reported that the catheterization showed no evidence of any significant disease and revealed
only minimal blockage. Dr. Bell reassured Plaintiff in terms of her heart. (R. at 505.)
Following the catheterization, Plaintiff had a low blood pressure reading and reported feeling
light-headed and dizzy. (R. at 425.) She also reported arrhythmia and migraines. Dr. Desai
listed his impressions as symptomatic supraventricular tachardia and migraines. He increased
her Neurontin medications for her migraines. (R. at 428.)

In April 1999, Plaintiff presented to Dr. Desai with complaints of heart palpitations at night.  (R. at 431.)  On May 17, 2009, Plaintiff complained of breathing difficulty.  Dr. Desai noted her peak flows on a pulmonary function test and opined that she had exacerbation of her COPD.  (R. at 434.)

**C.      Post-Date Last Insured (June 30, 1999)**

In September 1999, Dr. Desai listed a number of diagnoses, including hypotension, COPD, migraines, depression, Turner's syndrome, and weight loss.  (R. at 441.)

An October 1999 chest x-ray, which was taken due to Plaintiff's complaints of chest pain and chronic cough, showed that her obstructive lung disease remained unchanged from June 1998.  (R. at 512.)

In February 2000, Eric J. Heinzelmann, M.D. evaluated Plaintiff.  (R. at 447.)  His impressions included fibromyalgia, cardiac dysrhythmia, depression with anxiety, irritable bowel syndrom, history of bulimia, recovering alcoholic, recovering addiction to Soma, and migraine headaches.  (R. at 446.)

An April 2000 osteoporosis scan revealed the Plaintiff's bone density measurements were in the normal range.  (R. at 385.)

In May 2000, Plaintiff presented to Ronald L. Collins, M.D., with complaints of feeling tired and migraine headaches.  (R. at 408.)  In January 2001, Plaintiff reported back pain that resolved later that month.  Beyond the back pain, which Plaintiff indicated had improved "a great deal," Dr. Collins noted that Plaintiff "denie[d] any additional symptoms."  (R. at 413.)  It appears that Plaintiff cancelled her next appointment with Dr. Collins, which was scheduled for May 8, 2001.

In August 2002, Plaintiff reported to the emergency room with complaints of shortness of breath. She indicated that her shortness of breath had onset in October 2001, after she had "fallen back." (R. at 275.) The attending physician noted that Plaintiff was "otherwise without complaints." (*Id*.) Plaintiff denied any nausea, chest pain, abdominal pain, back pain, visual changes, or any other symptoms. (R. at 276.) The physician found no abnormalities in Plaintiff's heartrate, speech, gate, or muscle strength. (*Id*.) Her chest x-ray showed no abnormalities. She was discharged and instructed to follow up with a pulmonology specialist.

**D.     Case Analysis**

On August 11, 2009, after review of the record, Leigh Thomas, M.D., a Disability Determination Services consultant, stated that "[t]here is no new evidence to suggest the initial decision was in error. There is no evidence to suggest a severe physical impairment that limits functioning or ability to work." (R. at 322.)

## IV.     THE ADMINISTRATIVE DECISION

On May 31, 2011, the ALJ issued his decision. (R. at 12-21.) At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity during the period from her alleged onset date of August 15, 1994, through her DLI of June 30, 1999.  (R. at 14.)  The ALJ found that, through the DLI, Plaintiff had the severe impairments of Turner's syndrome; migraine headaches; asthma; osteoarthritis; degenerative disc disease of the cervical spine; depressive disorder; and a history of alcohol and marijuana abuse.  (*Id.*)  The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the sequential process, the ALJ evaluated Plaintiff's RFC.  The ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, [the ALJ] finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R.  404.1567(b), except the claimant can only occasionally climb, balance, stoop, bend, kneel, crouch, crawl, perform overhead reaching with her upper extremities, and push and pull with her lower extremities.

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

16

> She can perform simple unskilled work, with minimal public interaction, in a stable
> work environment, with little change in the work process from day-to-day. She can
> perform jobs that do not require exposure to excessive dust, smoke, chemicals,
> fumes, and other similar pulmonary irritants.

(R. at 17.)

Relying on the VE's testimony, the ALJ determined that there were jobs that existed in

significant numbers in nation that Plaintiff could have performed.  (R. at 20-21.)  He therefore

concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any

time from August 15, 1994, the alleged onset date, through June 30, 1999, the DLI.  (R. at 21.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Ullman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42

U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th

Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "When deciding under 42 U.S.C. § 405(g) whether substantial evidence supports the ALJ's decision, [the court does] not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff, in her Statement of Errors, advances more than fifteen contentions of error. Plaintiff's challenges to the supportability of ALJ's RFC assessment are well taken.[3] The Undersigned cannot conclude that the ALJ's RFC determination is supported by substantial evidence for at least two reasons. First, the Court is unable to conduct a meaningful review because the ALJ has failed to sufficiently articulate how he arrived at Plaintiff's RFC determination. Second, it appears that the ALJ failed to consider and evaluate all of the evidence in assessing the RFC.

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the Undersigned need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of an RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The  RFC assessm ent  must  include a na  rrative  discussion describing how the evidence supports each conclusion, citing specific m edical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a  day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can performed based on the evidence available in the case record. The adjudicator must also explain how any material  inconsistencies or am biguities  in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

It this case, the ALJ determined that Plaintiff could perform a limited range of light work, setting forth several exertional and non-exertional RFC limitations.  The ALJ proceeded to

acknowledge Plaintiff's testimony that she was disabled from the combination of a number of impairments and the medications she used to control her symptoms.  (R. at 18.)  He specifically noted Plaintiff's testimony that the medications she utilized to treat her migraines made her dizzy and sleepy.  (*Id.*)  The ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC he had set forth.  (R. at 18.)  The ALJ then proceeded with a general discussion of select portions of the medical evidence.  (R. at 18-19.)  He concluded his discussion as follows: "In sum, the above residual functional capacity assessment was supported by the numerous tests and notes regarding the claimant's impairments, especially the recent improvement in her symptoms; and her activities of daily living."  (R. at 20.)

Nothing in the foregoing discussion, however, informs the Undersigned of how the ALJ arrived at his RFC determination.  As the ALJ found, the record contains evidence of numerous severe physical and mental impairments, but is devoid of any opinions formally assessing Plaintiff's mental or physical functioning during the relevant time frame.  Moreover, the ALJ did not utilize a medical expert at the hearing.  He also failed to explain how the evidence he discussed supported the limitations he included in Plaintiff's RFC.  Similarly, although the ALJ acknowledged Plaintiff's testimony, the Undersigned is unable to discern, which, if any, of Plaintiff's statements he found credible.  Put simply, the Court can only speculate as to the bases for the ALJ's RFC.

20

The ALJ's lack of articulation prevents this Court from conducting meaningful review to determine whether substantial evidence supports his decision.  *See Rogers* 486 F.3d at 248 (quoting *Hurst*, 753 F.2d at 519) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review."); *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *4 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'").  This Court must, therefore, remand this action for an explanation of the reasoning supporting the ALJ's RFC determinations.  *See, e.g., Evans v. Comm'r of Soc. Sec.*, No. 1:10–cv–779, 2011 WL 6960619, at *14, 16 (S.D. Ohio Dec. 5, 2011) (Report and Recommendation), adopted, 2012 WL 27476 (S.D. Ohio Jan. 5, 2012) (remanding where the Court was "unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence he relied on in making that decision," explaining that "[s]imply listing some of the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the 'narrative discussion' requirement of SSR 96–8."); *Steadman v. Comm'r of Soc. Sec.*, No. 1:10-cv-801, 2011 WL 6415512, at *12 (S.D. Ohio Nov. 14, 2011) (same); *Perkins v. Comm'r of Soc. Sec.*, No. 1:10-cv-233, 2011 WL 2457817, at *5–6, 9 (S.D. Ohio May 23, 2011) (Report and Recommendation), adopted, 2011 WL 2443950 (S.D. Ohio June 16, 2011) (remanding where the ALJ's decision "fail[ed] to include a narrative explanation describing how the medical evidence of record supports the specific exertional limitations set forth in the ALJ's RFC finding); *Allen v. Astrue*,

21

No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) (remanding where "the ALJ failed to properly articulate the RFC calculation," explaining that the Court was "unable to trace the path of the ALJ's reasoning"); *Commodore v. Astrue*, No. 10-295, 2011 WL 4856162, at *4, 6 (E.D. Ky. Oct. 13, 2011) (remanding action "with instructions to provide a more thorough written analysis," where the ALJ failed to articulate the reasons for his RFC findings such that the Court could not "conduct a meaningful review of whether substantial evidence supports the ALJ's decision").

To be clear, the Court is not suggesting that SSR 96-8 requires a function-by-function analysis of Plaintiff's RFC. Nor is the Court suggesting that an ALJ is required to specifically reference every piece of evidence. Rather, the Court simply concludes that the ALJ's decision must provide some explanation of how the record evidence supports his or her RFC determination. *See* S.S.R. 96–8p, 1996 WL 374184, at *6–7; *Perkins*, 2011 WL 2457817, at *6 ("In rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at her RFC determination."); *Steadman*, 2011 WL 6415512 at *12 (same). This requirement is especially important given that the record does not contain any opinions assessing Plaintiff's functioning during the relevant time frame.

Further, the Undersigned cannot conclude that substantial evidence supports the ALJ's RFC determination because it appears he failed to consider and evaluate evidence bearing on the severity of Plaintiff's alleged symptoms, including evidence conflicting with his findings. For

example, the ALJ concluded that "[i]n terms of [Plaintiff's] migraines, those . . . improved and stabilized with medication." (R. at 19.)  The ALJ proceeds to reference treatment notes from four separate doctor visits spanning a four-year period.  The first is a 1994 visit at which Dr. Barnick noted that Plaintiff's headache syndrome was stable on a combination of medications. (R. at 19, 347.)  The second is a 1996 visit. With regard to this visit, the ALJ notes that Plaintiff "felt well using Soma." (R. at 19.)  He neglected to mention, however, that during this very visit, Plaintiff also reported experiencing a "significant migraine" once per month, and Dr. Barnick noted that her "migraine headaches remain a problem." (R. at 353.)  The third is a January 1997 visit at which Plaintiff reported that she felt "remarkably improved." (R. at 19, 356.)  Finally, the ALJ concludes that "[b]y May 1997, [Dr. Barncik] found that [Plaintiff] had a complete resolution of headaches on [P]rozac.'"[4]  (R. at 19.)  Although the ALJ correctly characterizes Dr. Barnick's notes from May 1997, he neglects to mention that just three months later, in August 1997, Plaintiff reported to Dr. Barnick that she continued to suffer from chronic and incapacitating headaches.  (R. at 358.)  Nor did he mention other record evidence that conflicts with his apparent finding that Plaintiff's headaches were improved and stable.  (*See* R. at 369 (in July 1998, Dr. Owings noted that Plaintiff had been unable to successfully control her headaches); R. at 371-72 (in August 1998, Dr. Carnes noted that Plaintiff's chief complaint was

---

[4]The ALJ also relies on medical records from 2008 and 2009 reflecting that Plaintiff had continued to seek treatment for chronic headaches.  These records, however, are hardly probative of the severity of Plaintiff's migraines during the relevant period given that they were generated nearly ten years after Plaintiff's DLI.  *See Torres v. Astrue*, No. 1:10-cv-109, 2011 WL 3107352, at *11 (S.D. Ohio July 25, 2011) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); and *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004)) ("[D]ocuments generated after expiration of the insured status are generally only 'minimally probative' and courts consider them only to the extent that they actually illuminate a claimant's health before expiration of insured status.").

migraines); R. at 428 (in March 1999, Dr. Desai increased Plaintiff's Neurotonin medication for migraines).)

The ALJ likewise failed to support his conclusion that Plaintiff's "depressive symptoms . . . improved with medication."  (R. at 19.)  Rather, the ALJ wholly fails to mention or discuss any of the relevant record evidence (*see e.g.*, R. at 350, 352, 356, 362, 363, 364, 371–71), instead citing treatment notes from 2008 and 2009.  These records, which were generated nearly ten years post-DLI, do not suffice as substantial evidence supporting the ALJ's conclusion.  *See Torres*, 2011 WL 3107352 at *11.  If anything, the records cut against the ALJ's conclusion as they demonstrate that Plaintiff continued to suffer from and seek treatment for depression.

Compounding these errors, the ALJ failed to consider the effects of Plaintiff's medications or to otherwise address her allegations that she was unable to work when under the influence of the medications she utilized to treat her migraines and depression.

In sum, in light of the foregoing, the Undersigned cannot conclude that substantial evidence supports the ALJ's RFC determination.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (holding that a court "cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result).  Given the age and scope of the relevant records, together with the nature of Plaintiff's severe impairments and the absence of a medical source opinion, a medical expert on remand could be beneficial.  *Cf. Smiley v. Comm'r of Soc. Sec.*, No. 3:11-cv-413, 2013 WL 427369, at *7 (S.D. Ohio Feb. 4, 2013) (citing *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)) ("The Court recognizes that there are limited occasions when the medical evidence is so

24

clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source."); *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494–95 (6th Cir. 2011) (remanding and noting that although the ALJ has no explicit or implicit duty to consult a mental health expert where the record lacks a formal assessment of mental functioning, the plaintiff was free to consider requesting appointment of a mental health expert, and the ALJ was free to *sua sponte* appoint one to assist in the development of an adequate record).

## VII.    CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  July 16, 2013                                          /s/ *Elizabeth A. Preston Deavers*
                                                             Elizabeth A. Preston Deavers
                                                             United States Magistrate Judge